NOT FOR PUBLICATION                                                      CLOSED

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ARLENE BROWN, | : |
| Plaintiff, | : |
| | : Civil No. 09-338 (FSH) |
| v. | : |
| | : **OPINION & FINAL JUDGMENT** |
| KESSLER INSTITUTE FOR REHABILITATION, INC., | : |
| | : Date: March 7, 2011 |
| Defendant. | : |

**HOCHBERG, District Judge:**

This case arises out of pro se Plaintiff's allegations that she was discriminated against on the basis of race during the course of her employment at Defendant Kessler Institute for Rehabilitation, Inc. A bench trial was held before this Court on February 15 and 16, 2011. This Court heard testimony from three witnesses: Plaintiff Arlene Brown, Mr. Kenneth J. Caldera, Kessler's Director of Human Resources, and Ms. Bonnie Evans, Chief Executive Officer of Kessler's West Orange facility. The Court has considered the evidence adduced at trial, and the legal arguments submitted by the parties. The case is now ripe for final judgment on the merits.

**FINDINGS OF FACT**[1]

Pro se Plaintiff Arlene Brown is an African American woman who was employed by the Kessler Institute for Rehabilitation, Inc. from 2001 through October 3, 2008. (Feb. 15 Tr. 50:9-

---

[1] In light of the fact that Plaintiff is proceeding pro se, this Court will set forth its findings of fact and conclusions of law in narrative form in an effort to make them clear and comprehensible to both parties.

50:21) For the duration of her employment at Kessler, Brown worked as an Office Administrator in the Out-Patient Case Management Department.[2] (Feb. 15 Tr. 53:8-54:2) The Out-Patient Case Management Department employed a number of individuals – several of whom were African American – who worked in the same office area. (Feb. 15 Tr. 54:3-55:2; Feb. 16 Tr. 64:9-64:15)

In 2001, 2002 and 2003, Brown received consistently positive performance reviews. (Ex. P-1, P-2, P-3) Brown's 2005 performance review[3] is also largely complimentary of her work, though it indicates that she "must improve her communication and interaction with other case management staff and work as a team." (Ex. D-30) In 2007, Brown's supervisor praised her proficiency at her work and her "knowledge and understanding" of the insurance issues she encountered. (Ex. D-31) The reviewer also noted that Brown had "intercountered [sic] numerous communication problems with OA peers and central admissions but is working to re[s]olve those miscommunications and place her efforts in team building." (Id.)

Brown characterized Kessler as a "tough place to work." (Feb. 15 Tr. 15:16) She did extra work discharging patients and working additional hours for more pay. (Feb. 15 Tr. 15:22-16:6) Though Kessler employees often collected money to purchase cakes to celebrate other employees' milestones, Brown testified that no one ever purchased a cake for her or gave her a card. (Feb. 15 Tr. 16:17-17:6, 17:18-17:25, 81:19-81:21)

I.   **BROWN'S INTERACTIONS WITH CYNTHIA CONROY**

At some point in 2004, Cynthia Conroy – a white employee – was transferred to the Out-

---

[2] At the outset of her employment, Brown's title was Medical Secretary or Case Coordinator. (Feb. 15 Tr. 53:8-53:22) Though her title changed when Select Medical Corporation purchased Kessler, her duties remained the same. (Feb. 15 Tr. 53:15-53:24)

[3] Brown's 2004 and 2006 performance reviewed were not introduced in evidence by either party.

Patient Case Management Department. (Feb. 15 Tr. 8:8-8:11, 9:6-9:8; Feb. 16 Tr. 92:22-92:24) Conroy was not Brown's supervisor, nor did she occupy a more senior position than Brown. Indeed, the two were co-workers at the same level in the Department.

Conroy and Brown had a tumultuous working relationship. Conroy cursed frequently and raised her voice to Brown and others in the Department. (Feb. 15 Tr. 9:11-9:25, 10:12-10:18) However, Brown acknowledged at trial that none of the profanity Conroy used was of a racial nature. (Feb. 15 Tr. 67:7-67:8) Conroy also adopted body language which Brown found confrontational. (Feb. 15 Tr. 13:24-13:25) Brown testified that Conroy was rude to co-workers and patients, and on one occasion indicated to Brown that she planned to send Brown calls from patients "who speak Creole." (Feb. 15 Tr. 11:13-11:25) Brown testified that Conroy was rude to both black and white patients and co-workers. (Feb. 15 Tr. 69:14-69:25) Conroy also frequently came to work crying. (Feb. 15 Tr. 24:19-24:20)

On two occasions during the few years they worked together, Conroy made comments to Brown about her eating habits which Brown viewed as derogatory and racially motivated. On one morning, Conroy expressed surprise that Brown was eating yogurt at her desk. (Feb. 15 Tr. 12:9-12:12) Another day, over lunch, Conroy told Brown that she would not have expected her to be eating a salad and thought she would have been eating a hamburger. (Feb. 15 Tr. 12:13-12:16) Brown did not bring either of these incidents to the attention of her supervisor or anyone else at Kessler. (Feb. 15 Tr. 68:12-68:14, 69:2-69:3)

At one point, Conroy told Brown repeatedly that she made Conroy sick to her stomach. (Feb. 15 Tr. 11:1-11:5) This caused Brown to shake uncontrollably and to leave her office. (Feb. 15 Tr. 11:5-11:9) The next day, Brown complained to her supervisor, Denise DiLorenzo, about Conroy's conduct. (Feb. 15 Tr. 11:10-11:15)

On another day in 2008, Conroy came to work later than normal. (Feb. 15 Tr. 18:18-18:24) Brown told Conroy that another member of the Department was looking for her. (Feb. 15 Tr. 19:5-19:6) Approximately ten minutes later, Conroy asked Brown if she had taken care of the patients who had been waiting. (Feb. 15 Tr. 19:10-19:12) Brown informed Conroy that she thought Conroy had been handling the patients. (Feb. 15 Tr. 9:12-9:14) The two had a testy verbal exchange about Conroy's work output which culminated with Conroy telling Brown to "bring it on." (Feb. 15 Tr. 9:14-9:20) Brown reported this incident to Kenneth Caldera, the Director of Human Resources. (Feb. 15 Tr. 19:21-19:23) This was the first time she had reported any problem to Caldera. (Feb. 15 Tr. 59:4-59:14, 73:4-73:12)

The day after the "bring it on" incident, Brown sent a two page, typed letter to Caldera outlining her history of conflict with Conroy and explaining what had transpired the previous day.[4] (Ex. D-14) The letter does not accuse Conroy of racial discrimination, nor tie any of Brown's complaints to her race. (Id.; Feb. 15 Tr. 79:18-79:22)

After the "bring it on" incident, Caldera testified that he investigated both Brown and Conroy's actions. (Feb. 16 Tr. 73:19-73:23) Caldera determined that the incident was a "miscommunication" and that Conroy did not physically threaten Brown. (Feb. 16 Tr. 73:24-73:25, 75:1-75:3)

On May 13, 2008, Brown received a "Disciplinary Action Form,"[5] on which her supervisor noted that:

---

[4] Though the letter is undated, it indicates that the "bring it on" incident occurred "yesterday." (Ex. D-14)

[5] A "Disciplinary Action Form" is an internal document used at Kessler to address employee performance issues. (Feb. 16 Tr. 58:20-58:24) When an employee is issued such a form, she is considered not in good standing for 90 days. (Feb. 16 Tr. 60:8-60:13)

4

> Arleen [sic] has failed to take steps to demonstrate and improve ability to communicate effectively with fellow colleagues in regards to workflow/intake process which negatively impacts customer service, workflow and fosters a negative work environment. For example, on 5/7, a colleague asked for a status of the IP-OP intakes from the prior day and Arleen was not able to provide an answer. Arleen was also asked for clarification on status of paper intakes in the folder and if Arleen took any processing. Arleen's response was not satisfactory, in that she responded to the effect "are you keeping counts on me." As a result, there was breakdown in workflow and an increase in unnecessary negativity.

(Ex. D-6)

> The following day, Brown sent an e-mail to Caldera, outlining her problems with Conroy:

> After my meeting with you regarding filing a formal complaint against Cynthia Conroy for her constant rude, and offensive behavior in the office and towards patients, other employees and myself. The management did have a meeting but they did not address her extremely rude behavior and tantrums....Yesterday, I was called into a meeting and given a written warning by Raquel (Pat Judd was present) because of miscommunication. Ken[,] I am being harassed and intimidated. I would like to come to work and do my work in peace. This is retaliation because I came and spoke with you and file[d] that complaint because Cynthia threatened me. As I mentioned to you before this constant but has escalated, as they have not addressed her behavior and the reason why I came to you is because she threatened me that day by saying "bring it on." I have witnesses as to her behavior in the office.

(Ex. D-7) The e-mail does not accuse Conroy or anyone else at Kessler of racial discrimination, nor does it set forth Brown's belief that any harassment she had suffered was of a racial nature. (Id.; Feb. 15 Tr. 78:6-78:8) Brown never orally reported to anyone at Kessler that she was being racially harassed, and Brown testified that she never submitted any documents accusing anyone at Kessler of racial discrimination. (Feb. 15 Tr. 78:7-78:8)

Brown later met with one of her supervisors at Kessler, Pat Judd, who informed her that both she and Conroy needed to improve in how they interacted with one another. (Feb. 15 Tr. 80:17-80:20)  Indeed, Conroy was issued a "Disciplinary Action Form" for the "bring it on"

incident as well.[6]  (Feb. 16 Tr. 93:9-93:14)

Brown submitted self-evaluations as part of the performance review process in each year from 2004 through 2008.  (Ex. D-13) Though the forms asked employees to articulate "particular problems in carrying out [their] specific duties," Brown never mentioned Cynthia Conroy, nor complained of discrimination of any kind.  (Id.; Feb. 15 Tr. 60:15-60:22)

## II.     2008 DISCIPLINARY ACTION AND TRANSFER REQUESTS

Brown claims that after the "bring it on" incident, her supervisors began to cite her for trivial infractions.  (Feb. 15 Tr. 19:23-20:10)  Though she had received a pay increase in each prior year she worked for Kessler, Brown did not receive a raise in 2008.  (Feb. 15 Tr. 49:1-49:8)

Brown received two additional "Disciplinary Action Forms."  (Exs. D-8, D-9)

On June 17, 2008, Brown was written up for being out of the office on June 12, 2008 without notice.  (Ex. D-8)  Her supervisor noted that because Brown had failed to give notice as directed, her manager "was unable to direct workflow in a timely proactive manner[, which]...negatively impacted the functioning" of her Department.  (Id.)  Kessler's policy is that any employee who calls out sick must notify her direct supervisor at least an hour before her shift is to begin.  (Feb. 16 Tr. 80:19-81:3)  Brown indicated on the form, and during her testimony at trial, that she called Caldera – not her direct supervisor, as required by Kessler's policy – to let him know she was out sick, although she conceded that her call was made several hours after she was to have reported to work.  (Ex. D-8; Feb. 15 Tr. 85:6-85:20) Caldera testified that he did not receive notice that Brown would be out until after Noon that day, hours after Brown's morning shift was to have begun.  (Feb. 16 Tr. 82:4-82:6)  Brown stated that she did not call at the proper time to notify Kessler that she would be out sick because felt too ill to call.

---

[6]  Conroy received another "Disciplinary Action Form" in 2005.  (D-29)

6

On August 11 2008, Brown was written up after a July incident in which she "did not communicate intake information to the OA team effectively and [] withheld pertinent intake information from fellow OA colleagues which resulted in delayed data entry input and scheduling confusion."  (Ex. D-9)  Brown's notes on the "Disciplinary Action Form" indicate that she viewed the situation as issue as a miscommunication and was "not sure what the issues are" in light of her long term and successful job performance at Kessler.

During the summer of 2008, Brown sought to transfer out of the Out-Patient Case Management Department and away from Conroy.  On September 11, 2008, Brown put in a written request for a transfer to an Office Manager position in Kessler's Chester facility.  (Ex. D-10)  Though she was interviewed for the position, Brown testified that she was told she was not qualified because she lacked managerial experience.  (Feb. 15 Tr. 22:14-23:4)  However, the written request form contains a handwritten note, which Caldera indicates is his notation that he informed Brown she was ineligible for the transfer because of her recent "Disciplinary Action Form."  (Ex. D-10, Feb. 16 Tr. 85:13-85:22)    Caldera testified that independent of this constraint, he did not believe that Brown was qualified for the position because she "did not have the specific management related experience that the organization was looking for the position." (Feb. 16 Tr. 91:21-91:23)

Brown also sought to be hired for two part time positions at Kessler.  (Feb. 15 Tr. 26:11-26:20) However, Brown was also ineligible for a transfer to these positions until November 2008. (Feb. 15 Tr. 26:21-27:1, 100:21-100:23)  Kessler's policy is that employees are ineligible for transfer to another position, as well as for any compensation increases, for the 90 days after they receive a "Disciplinary Action Form."  (Feb. 16 Tr. 61:3-61:7) The transfer policy is set forth in Kessler's employee handbook.  (Ex. D-5 at 11) Caldera testified that Kessler consistently enforces

this policy.  (Feb. 16 Tr. 88:22-88:24)

### III. BROWN'S DEPARTURE FROM KESSLER

On September 23, 2008, Brown submitted a hand-written letter to Caldera, which reads, in relevant part:

> Pursuant to our conversation on 9/11/08 and 9/17/08, I would hereby like to submit my resignation from my current full time position due to my school schedule effective October 3, 2008.  As mentioned, I would like to apply for the 22.5 hour position or if the KPS office manager position in the Chester facility is available I would like to interview for that position also.

(Ex. D-11) Brown's resignation does not mention Conroy nor allege that she was discriminated against on any basis.  Caldera testified that in his earlier meetings with Brown about her resignation, she did not say that she was unhappy working at Kessler, nor did she mention the disciplinary action taken against her or Cynthia Conroy.  (Feb. 16 Tr. 90:22-91:3) Instead, Brown told Caldera that she was returning to school.

Brown testified she resigned her position "because I had been taking classes continuously, and I decided to go back to school..."  (Feb. 15 Tr. 28:4-28:5) She also indicated that she had been told that being written up for disciplinary issues three times could be grounds for termination, though she acknowledges that no one ever told her that she would be fired from her position.  (Feb. 15 Tr. 103:18-105:11, 106:16-106:19)

By the time Brown left Kessler, she had already sought and accepted full time employment elsewhere.  (Feb. 15 Tr. 28:7-28:13, 107:20-108:21) At trial, Brown indicated that though she was resigning her full time position, she would have liked to maintain ties to Kessler, possibly by working there part time.  (Feb. 15 Tr. 99:14-99:23)

Brown testified that she was told that Caldera posted a photograph of her after she left Kessler, noting that she was not allowed back at the West Orange facility.  (Feb. 15 Tr. 27:5-27:6)

She also testified that as a result of the stress she endured while working at Kessler, Brown suffered from pain in her chest, a "warm feeling running down [her] leg," and break outs on her face. (Feb. 15 Tr. 17:8-17:12)

## IV. KESSLER'S EMPLOYMENT POLICIES

Both Bonnie Evans, the CEO of Kessler's West Orange facility – where Brown worked – and Caldera, the head of Human Resources at Kessler, testified at trial as to Kessler's efforts to ensure that it is an equal opportunity workplace.

Kessler's employees each receive a copy of the "Human Resources Employee Handbook." (Feb. 16 Tr. 17:11-17:21, 53:18-53:20) Indeed, Brown signed a form acknowledging that she had received the handbook when she began working at Kessler. (Ex. D-4) The handbook provides, among other things, that Kessler is "an equal opportunity employer committed to dealing with employees in a non-discriminatory manner and based on job-related qualifications and abilities." (Ex. D-5 at 2) The handbook also specifies that Kessler will not tolerate harassment of an employee of any kind. (Id. at 3)

The handbook further sets forth Kessler's "open door policy," which "encourages any employee who has a question, suggestion, concern or complaint" to speak to her supervisor or to contact senior management or human resources officials. (Id. at 2; Feb. 16 Tr. 21:2-21:4, 43:8-43:18) The handbook instructs employees seeking to report any violations of Kessler's policies or other laws to report those violations to the same individuals. (Id.; Feb. 16 Tr. 21:18-21:24, 44:4-44:11)

New employees at Kessler complete an orientation process which includes a presentation by Human Resources staff as to the employees' rights and obligations in an equal opportunity workplace. (Feb. 16 Tr. 17:1-17:10) Employees are required to complete re-orientation every

year that also addresses these issues, as well as how to report concerns or potential violations. (Feb. 16 Tr. 23:21-24:2, 41:22-42:9)

Throughout the time Brown was employed at Kessler, the company offered a toll free phone number employees could call with human resources questions they might feel uncomfortable raising with their supervisors or discussing in person.  (Feb. 16 Tr. 18:13-18:15, 18:23-20:11, 44:18-44:24)  A notice was posted at Kessler's West Orange facility in order to make employees aware of the hotline, though Brown denies ever having seen such a notice.  (Feb. 16 Tr. 45:1-45:4, 45:23-46:3, 47:25, 48:17-18)  Kessler also displays large posters summarizing various state federal laws relating to employee rights.  (Ex. D-3A, 3B, 3D Feb. 16 Tr. 49:21, 50:1-51:6)

## DISCUSSION & CONCLUSIONS OF LAW

Brown brings claims for race discrimination pursuant to Title VII of the Civil Rights Act of 1964, alleging retaliation, hostile work environment, constructive discharge and disparate treatment.

## I.     RETALIATION

"To establish a prima facie case of retaliation under Title VII, a plaintiff must tender evidence that: '(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.'"  Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)).

"Protected activity includes filing a claim of discrimination or otherwise opposing employment practices made illegal by Title VII.  To qualify as protected activity, a plaintiff's

opposition to an illegal employment practice must raise the issue of discrimination and identify the allegedly discriminatory practice." Seldon v. AMTRAK, 452 F. Supp. 2d 604, 610 (E.D. Pa. 2006) (citing Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 134 (3d Cir. 2006); Barber v. CSX Distribution Services, 68 F.3d 694, 701-02 (3d Cir. 1995)).

Complaints about "unfair treatment in general" are not protected activity. Barber, 68 F.3d at 701-02.

Brown did not raise the issue of race discrimination with her supervisor, with Caldera, or with anyone at Kessler. Her letters and e-mails to Caldera do not mention race, and she herself admitted that she did not bring a complaint of race discrimination at any time during her employment at Kessler. Though Brown complained about her co-worker Conroy's attitude toward her, these complaints about "unfair treatment in general" do not suffice to establish protected activity. See id. During the four years that she and Conroy worked side by side, their clashes erupted into incidents about three or four times and were never characterized as racial at the time, nor was anything about them racial when viewed in hindsight. Accordingly, this Court finds that Brown did not engage in any activity protected by Title VII and is not entitled to relief based on her retaliation claim.[7]

## II.     HOSTILE WORK ENVIRONMENT

---

[7] At the close of Plaintiff's case, Defendant moved for judgment as a matter of law. This Court hear argument on the motion and reserved judgment, and the trial continued. Judgment as a matter of law will be "'granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.'" Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007) (quoting Moyer v. United Dominion Indus., Inc., 473 F.3d 532, 545 n.8 (3d Cir. 2007)). Because this Court's determination that Brown has failed to prove her retaliation claim is the same even if the evidence is evaluated in the light most favorable to the Plaintiff and does not involve "weighing the evidence [or] determining the credibility of witnesses," judgment as a matter of law in favor of Kessler is appropriate as to this claim.

In order to prove her hostile work environment claim, Brown must demonstrate that (1) she suffered intentional discrimination because of her race; (2) the discrimination was pervasive and regular; (3) it detrimentally affected her; (4) it would have detrimentally affected a reasonable person of the same protected class in her position; and (5) there is a basis for vicarious liability. Cardenas v. Massey, 269 F.3d 251, 260, 263 (3d Cir. 2001).

Title VII is not "a generalized 'civility code.'" Jensen v. Potter, 435 F.3d 444, 451 (3d Cir. 2006) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)).

"The statute prohibits severe or pervasive harassment; it does not mandate a happy workplace. Occasional insults, teasing, or episodic instances of ridicule are not enough; they do not 'permeate' the workplace and change the very nature of the plaintiff's employment." Jensen, 435 F.3d at 451 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)); see also Caver v. City of Trenton, 420 F.3d 243, 262-63 (3d Cir. 2005) ("'[O]ffhanded comments[] and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim.' Rather, the 'conduct must be extreme to amount to a change in the terms and conditions of employment....'") (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 78 (1998)).

### A.     Intentional Discrimination on the Basis of Race

Intentional discrimination on the basis of race is the first element of a hostile work environment claim. Brown did not present any evidence at trial that the conduct of which she complained was based on race.[8] She did not, at any point, complain to anyone at Kessler about

---

[8] The only example Brown offered of her being treated differently than employees of a different race is her contention that she and other black employees were less likely to be the recipients of birthday cakes and cards than white employees. Brown offered no support for this other than her own testimony. Even if this Court were to credit Brown's testimony, this allegation is insufficient to support a hostile work environment claim, as set forth above.

12

race discrimination. While she complained about the conduct of Cynthia Conroy, she was unable to point to a single example of Conroy using a racial epithet and acknowledged that Conroy was rude to employees and patients regardless of their race. Brown testified that she believed Conroy's treatment of her to be tied to her race, but she was unable to offer any evidence in support of that conclusion.

  **B.** **Brown's Work Environment at Kessler**

Even if Brown had demonstrated that she was intentionally discriminated against on the basis of race, the facts of the instant case do not rise to the level of "pervasive and regular discrimination," sufficient to prove a claim that Brown was subject to a hostile work environment.

This Court credits Brown's testimony about her ongoing problems with Conroy. It is clear that Brown was devoted to her job at Kessler and felt alienated by her co-workers, most especially Conroy. However, the conduct outlined at trial is of precisely the occasional and episodic nature the Supreme Court has noted cannot be the basis of a hostile work environment claim. Brown worked at Kessler for seven years, yet her only specific complaint about her colleagues in general is that she was never given a cake or card for her birthday or at an appropriate milestone. She worked with Conroy for four of those seven years, yet testified to only a handful of incidents in which Conroy's conduct was problematic.

Brown testified to the following mistreatment by Conroy: (1) frequent cursing; (2) rudeness; (3) the use of confrontational body language; (4) two comments about the foods Brown was eating; (5) a comment that Brown made Conroy sick; and (6) the "bring it on" incident. Conroy's demeanor – including cursing, rudeness and body language – is basic incivility. It is unfortunate that Ms. Brown was subjected to the behavior of a rude co-worker, but Title VII was

not designed to protect employees from such general discourtesy. Conroy's two comments about the food Brown was eating – that she was surprised to see Brown eating yogurt and a salad – are not obviously hostile and, even if interpreted as derogatory, can hardly be said to be a form of severe harassment.

Conroy's comments that Brown made her sick and, finally, that Brown should "bring it on," – referring to Brown's comments about Conroy's inattention to her own work duties – amount to "occasional insults." The latter incident appears from the evidence presented at trial to have resulted from a miscommunication between co-workers that escalated to the level of a heated verbal interaction. Even this interaction did not include any physical contact – or even the serious threat of such contact – nor the use of any racial language. Moreover, Kessler's investigation of the incident – which this Court has no reason to discredit – suggested that both Brown and Conroy were at fault.

The limited conduct at issue here is not so severe, nor did it occur so pervasively, that it could have changed the nature of a reasonable employee. Indeed, it does not seem to have altered the "terms and conditions" of Brown's employment. She testified that she enjoyed her work and felt a sense of accomplishment at her ability to handle the demands of her job. (Feb. 15 Tr. 61:8-61:11, 62:23-63:6)

    **C.**    **Basis for Liability Against Kessler**

"An employer will be liable for the harassing conduct of the alleged victim's coworker if the employer was 'negligent or reckless in failing to train, discipline, fire or take remedial action upon notice of harassment.'" Andreoli v. Gates, 482 F.3d 641, 644 (3d Cir. 2007) (quoting Bonenberger v. Plymouth Twp., 132 F.3d 20, 26 (3d Cir. 1997)).

"An employer is negligent if it 'knew or should have known about the harassment, but

14

failed to take prompt and adequate remedial action.'  Even if the remedial action does not stop the alleged harassment, it is 'adequate' if it is 'reasonably calculated' to end the harassment." Andreoli, 482 F.3d at 644 (quoting Jensen v. Potter, 435 F.3d 444, 453 (3d Cir. 2006) (internal quotations omitted)).

Here, Kessler's potential liability is predicated only upon its responsibility for the harassing conduct of Conroy, Brown's co-worker. Brown never complained to Kessler officials about race discrimination of any kind, and she did not bring her problems with Conroy generally to anyone's attention until the spring of 2008, following the "bring it on" incident.  At that point, Caldera supervised an investigation of the incident, and both Brown and Conroy were issued "Disciplinary Action Forms" for their roles.  The form issued to Conroy notes that her "lack of communication and interpersonal skills does not meet the standards of performance for Kessler" and indicates that Conroy must take steps to improve her communication skills and work harder to listen to her co-workers.  (Ex. D-29) This Court has no basis upon which to conclude that these remedial actions were not adequate to address the issue recently brought to Kessler's attention by Brown.  Moreover, Kessler presented extensive evidence at trial that all of its employees – including Conroy and Brown – received training regarding their rights and obligations in an equal opportunity workplace.  Kessler is not liable for harassment based on the facts of this case.

### III.     CONSTRUCTIVE DISCHARGE

To establish a claim for constructive discharge, "a plaintiff must show that 'the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'"  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084 (3d Cir. 1996) (quoting Goss v. Exxon Office Systems Co., 747 F.2d 885, 888 (3d Cir. 1984)).

Constructive discharge imposes a higher burden of proof as to the level of discrimination

and harassment that occurred than on a hostile work environment claim. See e.g., Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 317 (3d Cir. 2006) (noting that "[a] hostile work environment will not always support a finding of constructive discharge" and that proof of constructive discharge requires a demonstration of "a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment") (internal quotations omitted); Tunis v. City of Newark, 184 Fed. Appx. 140, 142 (3d Cir. 2006) (contrasting the "considerably high burden required to prove constructive discharge" with the "less onerous burden required to prove hostile environment claims").

Brown has failed to prove that she suffered discrimination sufficient to sustain a hostile work environment claim. Accordingly, she cannot prove that she has suffered discrimination sufficient to meet the higher burden of proving a constructive discharge claim. Moreover, the record contains considerable evidence that Brown did not resign as a result of discrimination but instead because she intended to return to school or pursue other employment. Indeed, Brown told Caldera in person she was resigning in order to begin classes, and her handwritten letter to Caldera repeats this rationale. She began work for a new employer on the Monday following her Friday resignation from Kessler, and she had already sought and accepted the new position before she had resigned from Kessler.

## IV.    DISPARATE TREATMENT

A disparate treatment claim asserted under Title VII is analyzed under the burden-shifting framework established by McDonnell Douglas v. Green, 411 U.S. 792 (1973). Under that framework, a plaintiff challenging an adverse employment decision has the initial burden of establishing a prima facie case of discrimination by demonstrating that she: 1) belongs to a protected class; 2) was qualified for the employment benefit sought, and that 3) nonmembers of

the protected class were treated more favorably. See id. at 802; see also Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 318 (3d Cir. 2000).  The burden then shifts to the employer to proffer a legitimate, nondiscriminatory reason for the decision. See McDonnell Douglas, 411 U.S. at 802.  Finally, the burden shifts back to the plaintiff to show that the nondiscriminatory reasons articulated by the employer are pretextual. See id. at 804.

Disparate treatment "'is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race....Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment.'"  Hampton v. Borough of Tinton Falls Police Dep't, 98 F.3d 107, 112 (3d Cir. 1996) (quoting Teamsters v. United States, 431 U.S. 324, 355 n.15 (1977)).

Brown claims disparate treatment in (1) the denial of her requests for transfers to other positions and (2) the taking of disciplinary action against her.  At trial, she failed to adduce evidence that non-members of her protected class were treated differently than she was, nor that the non-discriminatory reasons articulated by Kessler are pretextual.

Brown was denied a request for transfer three times: once to a management position in Kessler's Chester facility and twice to part-time positions at Kessler's West Orange facility. Brown did not introduce any evidence as to the race of the individuals ultimately selected to fill those positions or as to the racial makeup of Kessler's employees more generally.  Additionally, Caldera testified that Kessler consistently adheres to the policy outlined in the employee handbook that employees who have received a "Disciplinary Action Form" are not eligible for a transfer for 90 days.  The evidence in the record is clear that Brown applied for all three of the transfers at issue within 90 days of the issuance of a "Disciplinary Action Form."  Nothing in the record suggests that this explanation for the denials of Brown's transfer requests is pretextual.

Nor can the issuance of the 2008 "Disciplinary Action Forms" against Brown be the basis of a successful disparate treatment claim. The first "Disciplinary Action Form," was issued after the "bring it on" incident. As Caldera testified, and as Conroy's personnel file demonstrates, Conroy – a white employee – was also issued a "Disciplinary Action Form" following the incident. Indeed, Conroy received multiple "Disciplinary Action Forms" during the time she worked alongside Brown. More generally, Brown did not introduce any evidence to suggest that Kessler disciplined black employees more frequently or for more trivial conduct than white employees.

Kessler also proffered legitimate explanations for the issuance of each of the "Disciplinary Action Forms." Caldera testified that his investigation of the "bring it on" incident led him to believe there was fault on both sides of the altercation. Brown testified that Conroy was at fault, but her assertion of her own blamelessness does not establish that Kessler's explanation is pretextual. Caldera also indicated that the June 2008 "Disciplinary Action Form" was the result of Brown's failure to follow Kessler's policies about timely notifying supervisors of absences. At trial, Brown did not dispute that she failed to follow the policy in calling Caldera instead of her supervisor and doing so well after she was to begin her shift. Finally, Caldera testified that the third "Disciplinary Action Form" was the result of a communication problem between Brown and other members of her department. Brown did not dispute this characterization of events except to note that she thought the issues raised by the "Disciplinary Action Form" were trivial. Brown's explanations, to the extent she proffered them, are not sufficient to carry her burden of proof that the legitimate, non-discriminatory explanations for the three "Disciplinary Action Forms," is pretextual.

## **CONCLUSION & FINAL JUDGMENT**

For the reasons set forth above, this Court adjudges all claims in favor of Defendant Kessler Institute for Rehabilitation, Inc.

The Clerk of the Court is directed to close the case.

/s/   Faith S. Hochberg
**Hon. Faith S. Hochberg, U.S.D.J.**